# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

LAKESIDE FBBC, LP,

    *Plaintiff*,

v.

EVEREST INDEMNITY INSURANCE
CO. et al.,

    *Defendants.*

§
§
§
§
§
§
§
§
§
§

Civil Action No. SA-17-CV-491-XR

## ORDER ON MOTION FOR SUMMARY JUDGMENT

On this date, the Court considered Everest Indemnity Insurance Company, Engle Martin &
Associates, and Christopher McCoys' (collectively, "Defendants") motion for summary judgment
(docket no. 49), Plaintiff Lakeside FBBC's ("Plaintiff") response (docket no. 50), and Defendants'
reply (docket no. 51). After careful consideration, Defendants' motion is GRANTED.

## BACKGROUND

This case arises out of a series of weather events—a hailstorm in 2016 and tornado in 2017—
that damaged Plaintiff's property and the subsequent dispute over the amount and timing of insurance
payments. Plaintiff owns the Alagrita Lakeside Apartments ("the Property"), a large apartment
complex located at 8555 Laurens Lane in San Antonio, Texas. Docket no. 50-1 at 1. Defendant
Everest Indemnity Insurance Company ("Everest") insured the Property under two consecutive
insurance policies.

### I.    The 2016 Hailstorm Claim

The first policy, Policy No. CA3P004930151, was effective from November 2015 to
November 2016. Docket no. 49-1 at 1. During that coverage period, on April 12, 2016, a hailstorm
caused substantial damage to the Property. Docket no. 50-1 at 1. On April 20, Plaintiff provided

written notice of that loss to Everest. *Id.* Everest hired Defendant Engle Martin & Associates ("Engle Martin") as the adjuster, who assigned Defendant Christopher McCoy ("McCoy") to the claim. *Id.* at 1. McCoy assigned this loss the claim number 2000098552 ("the hail claim").

On April 22, McCoy emailed Cary Krier ("Krier"), Plaintiff's property insurance claim representative. *Id.* at 1; docket no. 51-1 at 3–4.[1] McCoy asked Krier for all local contact details so that he could arrange an inspection. *Id.* at 4. He further asked that Krier provide any contractors' information, bids, and/or invoicing received by that date so that Defendants could proceed with the claim investigation. *Id.* Krier responded by telling McCoy to speak with Carolyn Coleman ("Coleman"), who worked for Plaintiff's primary contractor, Tice Enterprises ("Tice"). *Id.* at 3. Coleman noted that she would not be available for several days because of the extensive storm damage in the area. *Id.* at 2. A few days later, on April 26, McCoy made a preliminary inspection to begin the loss assessment. Docket no. 50-2 at 1, 3.

On May 13, 2016, Coleman advised McCoy that she was still "approximately a week away from finalizing the details and estimate related to" the Property, the delay due to the significant amount of storm damage in the area. *Id.* at 3–4. Having received nothing over a month later, McCoy reiterated his request for a draft estimate on June 17. Docket no. 51-1 at 1. On June 24, McCoy emailed Krier to let her know Engle Martin was in the process of compiling estimates and that it was still awaiting the estimate from Coleman to move forward with the loss assessment. Docket no. 51-2 at 1. McCoy attached a preliminary Statement of Loss for items that McCoy had already received. *Id.* McCoy noted in that email that Everest agreed to issue an advance payment of $250,000 and that Plaintiff would need to sign and notarize the Proof of Loss for Everest to disburse that payment, as a

[1] That email also references a prior voicemail McCoy left with Krier. *Id.* at 4. *See also* 50-2 at 3 (noting that McCoy left a voice message and follow-up emails immediately upon receiving notice of the claim).

signed proof of loss is a requirement for payment under both policies. *Id.* at 1–2. Specifically, the

policy reads:

> We will pay for covered loss or damage within 30 days after we receive the sworn
> proof of loss, if you have complied with all of the terms of this Coverage part, and: (1)
> We have reached agreement with you on the amount of loss; or (2) An appraisal award
> has been made.

Docket no. 49-1 at 48; no. 49-2 at 46 (same).

Krier responded to that email on June 27. *Id.* at 1. She noted that Plaintiff had several costs

that were not on McCoy's preliminary Statement of Loss and asked what the process was for updating

that list. *Id.* McCoy responded by again asking Krier to:

> provide all support documents you have that are related to the subject hail claim, as
> [the] statement of loss only reflects the items received to date through your contractor
> [Coleman], as the person you directed us to work with. As these are received, we will
> review and update as necessary, including the Mockingbird invoice you just forwarded
> as this was not previously received." *Id.*[2] In that same email, McCoy reiterated that
> they were awaiting the executed Proof of Loss so that Everest could issue the $250,000
> advance.

*Id.*

On July 7, 2016, Krier returned that signed and notarized Proof of Loss, apologizing for delay

and indicating she thought she had already done so. Docket no. 51-4 at 3.[3] McCoy responded the

following day by reiterating that Engle Martin had still not received an estimate from Plaintiff's

contractor (Coleman) and that Krier should forward any other expenses related to the subject hail loss

that were not included in the preliminary Proof of Loss so that the loss could be updated and finalized.

*Id.* at 2.

---

[2] The Mockingbird invoice that McCoy mentions here refers to an invoice from a storm cleaning service that
was billed to Plaintiff on April 27. Docket no. 51-3 at 4. Krier forwarded this to McCoy on June 27, noting
that "Chris, here's another one I guess we haven't paid." *Id.*

[3] Everest subsequently issued the check for $250,000 on July 21, 2016. Docket no. 49-3 at 1.

On July 22, 2016, McCoy sent another email to Krier, explaining that Engle Martin received authorization from Everest to obtain an additional proof of loss for $1,672,031.67. Docket no. 51-4 at 2. This number—which Defendants refer to as the "undisputed amount of the loss at that time"— represented the measured loss to date ($2,289,439.12), minus the deductible ($5,000), minus depreciation ($362,407.45), and minus the first advance payment ($250,000). *Id.* In that email, McCoy reminded Krier that he was still waiting on a loss estimate from Coleman, which was not yet included in the estimated amount. *Id.* McCoy wrote that, as with the first, Plaintiff would need to execute and notarize this second Proof of Loss for Everest to issue payment. *Id.*

McCoy did not hear back for several weeks. On August 5, 2016, Coleman responded with the contractor's estimate. Docket no. 51-5 at 1. On August 16, McCoy wrote to Krier to inform her of his receipt of that contractor's estimate but noted that McCoy had still not received a response regarding the second partial Proof of Loss McCoy sent to Krier three weeks earlier. Docket no. 51-4 at 1. That email also re-urged Krier to submit any other supporting documentation regarding other expenses associated with the hailstorm, as Krier noted before that she believed there were items missing from the second Proof of Loss. *Id.* During the subsequent weeks, McCoy met with another building consultant to further determine the scope of damage, as well as an on-site inspection with Coleman to do the same. Docket no. 51-7 at 1; no. 51-6 at 1.

Plaintiff initially refused to sign the second Proof of Loss for $1,672,031.67. Instead, Plaintiff hired a new estimator, David Wall ("Wall"), who conducted an evaluation of the damage. Docket no. 49-4 at 2. Wall estimated that the total cost of repair amounted to $6,175,536.72. On October 28, 2016, Plaintiff's attorney, Todd Lipscomb ("Lipscomb"), sent a letter to Everest, warning Everest of its alleged violations of the Deceptive Trade Practices-Consumer Protection Act ("DTPA") and the Texas Insurance Code. *Id.* at 1–3. In that letter, Lipscomb explained that Plaintiff was refusing to sign

Defendants' proposed Proof of Loss (the one for $1,672,031.67) because it "grossly underestimated the actual costs to repair the storm damage to the property." *Id.* at 2. Given that refusal, and Plaintiff's new estimate as to cost of repair, Lipscomb attached a new Proof of Loss totaling $6,175,536.94. *Id.*[4]

On November 23, Everest (through McCoy) expressly rejected that amount. Docket no. 50-3 at 1. In a letter to Lipscomb, McCoy resubmitted the prior Proof of Loss totalling the "undisputed Actual Cash Value" of $1,672,031.67. *Id.* In that same letter, McCoy informed Lipscomb that he was still working with Plaintiff's contractor (Coleman) to obtain a proper estimate but that Coleman was including uncovered items in the estimate and that Plaintiff should remove those. *Id.* at 2. The letter agreed that there may be claimed items not yet included in the Proof of Loss and that Plaintiff should submit those (and supporting documentation) to further resolve the claim. *Id.* at 1. Specifically, the letter requests that Plaintiff provide documentation supporting the "temporary repairs" total of $115,002.06 that Plaintiff's proposed Proof of Loss included but for which Plaintiff had not yet sent any documentation. *Id.* at 2. On November 28, 2016, Plaintiff "reluctantly" signed the Proof of Loss for $1,672,031.67. Docket no. 51-8 at 2; no. 50-1 at 2. In the letter which included that signed Proof of Loss, Lipscomb noted that "We are in the process of collecting the documents requested in your November 23, 2016 letter, and we hope to provide this documentation soon." Docket no. 51-8 at 1. Engle Martin sent Plaintiff a check for $1,672,031.67 on December 13, 2016. Docket no. 49-5.

---

[4] This amount expressly excluded lost rents and water extraction costs. Docket no. 49-4 at 2. Plaintiff did not submit any estimate for lost rents until November 17, 2016 when it told McCoy that lost rents up to October 2016 totaled $1,106,403. Docket no. 51-10.

On December 11, 2016, McCoy sent a letter to Krier and Lipscomb requesting information so that McCoy could begin his investigation into the business interruption claim. Docket no. 51-11 at 1. McCoy, who hired a forensic accountant to investigate this claim, provided a list of fourteen items for Plaintiff to address. *Id.* On January 30, 2017, McCoy sent another email to Plaintiff, indicating he had not received any response to those requests. Docket no. 51-9 at 1. Defendants maintain that they have not received sufficient supporting documents to allow them to make a payment, so they did made no payment for business interruption until appraisal was completed. Docket no. 51-12 at 3.

In the subsequent months, the parties continued their re-inspections and attempts to resolve the claim. On January 6, 2017, McCoy conducted another inspection of the property and promised an updated proposal within nine days. Docket no. 51-9 at 1. McCoy did not provide an update until January 30. *Id.* In an email to Lipscomb, Krier, and Coleman, McCoy also indicated that he was awaiting a newly adjusted estimate from Coleman, along with supporting documentation for emergency repairs. *Id.* These are the documents that McCoy initially requested in his letter on November 23, 2016 but which he had not received by the end of January. Docket no. 50-3 at 2.

## II.    The 2017 Tornado Claim

As the above claim investigation continued, an EF-1 tornado struck the Property on February 19, 2017. Docket no. 50-1 at 2. By now, the Property was covered under a new policy issued by Everest, Policy No. CA3P004930161, which was effective from November 2016 to November 2017. Docket no. 49-2 at 5. Engle Martin assigned Thomas Koralewski ("Koralewski") to this claim, claim number 2000108136 ("the tornado claim."). Docket no. 50-1 at 2.[5]

On February 22, 2017, Plaintiff provided written notice of the loss to Everest. *Id.* at 2, 12. Koralewski contacted Krier who—as with the hail claim the prior year—directed the adjuster to contact Plaintiff's contractor, Coleman. Docket no. 50-4 at 5. Koralewski and Coleman first inspected the property on March 1. *Id.* at 2; docket no. 50-4 at 1. On March 31, Koralewski sent an email to Krier requesting several things that Coleman previously promised: an estimate, an engineer's evaluation, and Coleman's photographs of items that Koralewski was not able to visually inspect during his visit because of the structural damage. Docket no. 50-5 at 1. McCoy stressed that "it is

---

[5] Koralewski was previously a named defendant, but the Court dismissed him as improperly joined because Plaintiff's allegations that Koralewski (and his employer, Engle Martin) were "biased" was conclusory, because Plaintiff provided no specific misrepresentations made by Koralewski, and because insurance adjusters cannot be liable under the TPPCA. Docket no. 17.

imperative that we separate any visible damage that occurred related to this event [the tornado claim] from the pre-existing damages that occurred approximately one year prior [for the hail claim]." *Id.*

On April 28, Lipscomb—again working on behalf of Plaintiff—provided Koralewski with the requested engineering report and contractor estimate. Docket no. 50-6 at 1; no. 50-1 at 2. Plaintiff's estimate amounted to over $700,000, whereas Koralewski's was $22,000. Docket no. 50-6 at 1.[6] Koralewski noted that the "delta" between these two estimates is because Plaintiff's estimate included roof repair which was caused by the hailstorm the year prior. *Id.* Given the large disparity, Koralewski suggested that Engle Martin again hire the same building inspector that McCoy used the previous year. *Id.* Though the record does not reveal any signed Proof of Loss associated with the 2017 tornado, Everest issued a check for $8,029.86 on February 22, 2018. Docket no. 50-1 at 2; no. 49-7 at 1.

### III. Litigation and Appraisal Awards

On April 27, 2017—the day *before* Plaintiff sent its engineering report and contractor's estimate to Koralewski—Plaintiff filed its original petition in the 150th District Court of Bexar County, Texas, complaining of Defendants' actions in the handling of both claims. Docket no. 1-1. Everest removed the case to this Court on June 2, 2017 and on January 26, 2018, the Court granted Defendants' motion to compel appraisal. Docket no. 44.[7]

---

[6] With respect to the tornado claim, Plaintiff did not file a claim for business interruption before filing suit. Docket no. 51-12 at 3.

[7] Both policies contain an appraisal provision. It reads:

> If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will: (a) pay its chosen appraiser; and (b) bear the other expenses of the appraisal and umpire equally. If there is an appraisal, we still retain our right to deny the claim.

That appraisal was conducted in two rounds: one for property damage and another for business interruption. The property appraisal was issued on November 7, 2018. Docket no. 49-8 at 1. For the 2016 hail claim, the appraisers awarded a total of $4,247,147.74 for replacement cost value. *Id.* With depreciation of $96,402.17, the actual cash value of the award amounted to $4,150,745.57.[8] For the 2017 tornado, the appraisers awarded a replacement cost value of $255,861.82. Docket no. 49-8. With no depreciation, the actual cash value was the same amount as the replacement cost value. *Id.* A week later, on November 14, 2018, Everest issued checks for actual cash value: $2,228,713.90 for the hail claim[9] and $247,831.96 for the tornado claim.[10] Docket nos. 49-10, 49-11. For each, Everest paid only actual cash value because repairs were not completed, and the policies both require the insured to repair or replace the damaged property to receive replacement cost value. Docket no. 49-1 at 52. Specifically, the policies state:

> We will not pay on a replacement cost basis for any loss or damage:
> (1) Until the lost or damaged property is actually repaired or replaced; and
> (2) Unless the repair or replacement is made as soon as reasonably possible after the loss or damage.

*Id.* (policy covering hail claim); see *also* docket no. 49-2 at 50 (policy covering tornado claim).[11]

According to its response, as of December 2019, Plaintiff is still "in the process of making the repairs" to the Property and claims it would have done so earlier if Everest had properly paid Plaintiff. Docket no. 50-1 at 2.

---

Docket no. 49-1 at 47; no. 49-2 at 45.

[8] Actual cash value is defined as "replacement cost minus normal depreciation." BLACK'S LAW DICTIONARY (11th ed. 2019).

[9] This amount was calculated by taking the appraised ACV ($4,150,745.57) and deducting the two pre-appraisal payments made to Plaintiff ($250,000 and $1,672,031.67).

[10] This amount was calculated by taking the appraised ACV ($255,861.82) and deducting the one pre-appraisal payment made to Plaintiff ($8,029.86).

[11] The distinction here is relevant only for the hail claim, as for the tornado claim appraisal the actual cash value and replacement cost value were the same. Docket no. 49-8.

The <u>business interruption appraisal</u> award was finalized on May 1, 2019. Docket no. 49-12 at 1–2. For the 2016 hail claim, the appraisal valued the loss of business income at $91,544. *Id.* at 1. For the 2017 tornado claim, the appraisal valued the loss of business income at $511,748. *Id.* at 2. On May 16, 2019, Everest made payments of $91,544 and $511,748, representing the full appraised amount of lost business income. Docket no. 49-13.

In sum, Everest has made the following payments to Plaintiff:

| Amount | Date | Reason for Payment | Citation |
|---|---|---|---|
| $250,000 | July 21, 2016 | Advance cash payment on hail claim | Docket no. 49-3 |
| $1,672,031.67 | December 13, 2016 | Undisputed amount of loss on hail claim | Docket no. 49-5 |
| $8,029.86 | February 22, 2018 | Advance cash payment on tornado claim | Docket no. 50-1 |
| $2,228,713.90 | November 14, 2018 | Appraised ACV of hail claim, minus payments already made | Docket no. 49-10 |
| $247,831.96 | November 14, 2018 | Appraised ACV of tornado claim | Docket no. 49-11 |
| $91,544 | May 16, 2019 | Appraised lost business income on hail claim | Docket no. 49-13 |
| $511,748 | May 16, 2019 | Appraised lost business income on tornado claim | Docket no. 49-13 |

The dispute now turns on two issues: the amount and timing of those payments.

## DISCUSSION

## I.    Standard of Review

The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56.

To establish that there is no genuine issue as to any material fact, the movant must either submit evidence that negates the existence of some material element of the non-moving party's claim or defense, or, if the crucial issue is one for which the non-moving party will bear the burden of proof at trial, merely point out that the evidence in the record is insufficient to support an essential element of the non-movant's claim or defense. *Lavespere v. Niagara Machine & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990). Once the movant carries its initial burden, the burden shifts to the non-movant to show that summary judgment is inappropriate. *See Fields v. City of S. Hous.*, 922 F.2d 1183, 1187 (5th Cir. 1991).

For a court to conclude that there are no genuine issues of material fact, the court must be satisfied that no reasonable trier of fact could have found for the non-movant, or, in other words, that the evidence favoring the non-movant is insufficient to enable a reasonable jury to return a verdict for the non-movant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making this determination, the court should review all the evidence in the record, giving credence to the evidence favoring the non-movant as well as the "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). The Court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment, *id.* at 150, and must review all facts in the light most favorable to the non-moving party. *First Colony Life Ins. Co. v. Sanford*, 555 F.3d 177, 181 (5th Cir. 2009).

## II.  Analysis

Plaintiff brings the following claims: (1) breach of contract; (2) breach of the common law duty of good faith and fair dealing; (3) statutory bad faith under Chapter 541 of the Texas Insurance Code and the DTPA; and (4) delays in violation of Chapter 542 of the Texas Insurance Code, also

known as the Texas Prompt Payment of Claims Act ("TPPCA"). Docket no. 1-1. Defendant moves for summary judgment on all claims.

## A. Breach of Contract[12]

Plaintiff first brings a breach of contract claim against Defendant Everest, claiming that Everest "breached its contractual obligations and the subject insurance policy by failing to pay Plaintiff policy benefits for the cost to properly repair the…hail storm damage to its property" and by failing to timely investigate, adjust, and pay the claim. Docket no. 1-1 at 14. Everest, in turn, argues that because Everest has paid the appraisal award in full, it cannot be held liable for breach of contract. Docket no. 49 at 7. Everest reasons that where appraisal is the contractually mandated means of determining the amount of loss attributable to a given claim, and where the insured pays the amount determined by the appraisal, Everest has fully complied with its contractual obligations. *Id.* While Plaintiff concedes that Everest has paid the appraised actual cash value, Plaintiff argues that Everest has not *fully* paid the appraisal value because Everest withheld depreciation for the hail claim, i.e. because Everest did not pay the *replacement cost value*.[13] Everest responds that it need not pay replacement cost value at this time because Plaintiff has not repaired or replaced the property but that when Plaintiff does so, Plaintiff can submit a supplemental request for further replacement cost payments. Docket no. 51 at 2–6.[14]

---

[12] Plaintiff withdraws its breach of contract claim with respect to the 2017 tornado claim because Defendant paid the full appraisal value, given that there was no difference between the actual cash value and replacement cost for that claim. *See* docket no. 50 at 1–2, 7. Thus, the only remaining breach of contract claim for the Court to consider is breach of contract with respect to the 2016 hail claim.

[13] Consistent with its rationale for dismissing its breach of contract claim for the 2017 tornado, Plaintiff concedes that "[i]f Everest had fully paid the appraisal award [for the hail claim], Plaintiff would agree that its claims for breach of contract, common law bad faith, and violations of Chapter 541 of the Texas Insurance Code should be dismissed…." Docket no. 50 at 1–2.

[14] Plaintiff also argues that "[t]o the extent that [Plaintiff] has further business income loss…Plaintiff would be entitled to maintain its breach of contract, statutory, and common law claims" for dates beyond the appraisal award. Docket no. 50 at 9–1 0. Plaintiff concedes that "it cannot present evidence at this time on this matter" because Plaintiff has been unable to conduct discovery on the matter. What this reasoning overlooks is that

The elements for breach of contract are familiar: a plaintiff must show: (1) the existence of a valid contract; (2) the plaintiff performed or tendered performance; (3) the defendant breached the contract; and (4) the plaintiff was damaged as a result. *Beverick v. Koch Power, Inc.*, 186 S.W.3d 145, 150 (Tex.App.—Houston [1st Dist.] 2005, pet denied). The parties here do not dispute the existence of a valid contract—the insurance policy in place at the time of the hailstorm. The dispute turns solely on whether Defendants breached the contract in their failure to abide by their contractual obligations. Indeed, Plaintiff admits that if Defendants paid the full appraisal value, Plaintiff would have no breach of contract claim.[15]

The facts here are undisputed: Everest timely paid the <u>actual cash value</u> as determined in the appraisal. Plaintiff argues it should receive <u>replacement cost value</u>. The central issue, then, is what constitutes the full appraisal award: actual cash value or replacement cost value? Both the plain meaning of the contract and cases interpreting similar or identical language lead the Court to find that Defendants' payment of actual cash value constitutes full payment of the appraisal award where Plaintiff has made no repairs, thereby barring Plaintiff's breach of contract claim.

---

*Plaintiff* is the party that would have relevant materials on *Plaintiff's* loss of business. The Court has no reason to believe that further discovery would somehow permit Plaintiff to bring forth viable evidence—presumably evidence already within Plaintiff's control—that it has been unable to produce thus far. Accordingly, the possibility of any post-appraisal lost business income will not serve to save the breach of contract, statutory, or common law claims.

[15] As Plaintiff's concession reveals, the law here is clear. *See, e.g. Mainali Corp. v. Covington Specialty Ins. Co.*, 872 F.3d 255, 258 (5th Cir. 2017) (finding that under Texas law "[c]ourts have…repeatedly rejected breach of contract claims when an insurer timely paid an appraisal award"); *Nat'l Sec. Fire & Cas. Co. v. Hurst*, 523 S.W.3d 840, 845 (Tex.App.—Houston [14th Dist.] 2017, no pet.) ("Under Texas law, when an insurer makes timely payment of a binding and enforceable appraisal award, and the insured accepts the payment, the insured is estopped by the appraisal award from maintaining a breach of contract claim against the insurer."); *Quibodeaux v. Nautilus Ins. Co.*, 655 Fed. App'x 984, 986–87 (5th Cir. 2016) ("Under Texas law, an insurer's timely payment of a binding and enforceable appraisal award, and the insured's acceptance of the payment, estops the insured from maintaining a breach-of-contract claim against the insurer.").

First, the contract is unambiguous. The contract states that Everest will not pay replacement cost for any loss or damage "(1) [u]ntil the lost or damaged property is actually repaired or replaced; and (2) [u]nless the repair or replacement is made as soon as reasonably possible after the loss or damage." Docket no. 49-1 at 52. As of December 6, 2019—over 3 years and 7 months since the hailstorm—Plaintiff concedes that it has not repaired or replaced the property. Docket no. 50-1 at 2. If Plaintiff has not replaced or repaired the damaged property, under the plain meaning of the contract, it is not yet entitled to replacement cost value. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005) (explaining that terms will be given their "plain, ordinary, and generally accepted meaning unless the contract itself shows them to be used in a technical or different sense.").

Second, the case law supports Defendants' position that actual cash value is the relevant amount. In fact, Plaintiff cites to no authority holding that an insurer must pay replacement cost value, even when the replacement or repairs are not completed. Plaintiff's use of *Ortiz* is misplaced and misleading; it correctly raises *Ortiz* for the proposition that "when an insurer timely pays an appraisal award *in full*, that insurer cannot be liable to the insured for breach of contract" but incorrectly attempts to distinguish this case by explaining that the insurer in *Ortiz* paid the "full appraisal award" while Everest here did not. *See* docket no. 50 at 8 (citing *Ortiz v. State Farm Lloyds*, 589 S.W.3d 127 (Tex. 2019)). While it is true that the Texas Supreme Court itself does not indicate whether the insurer in *Ortiz* paid actual cash value or replacement cost, the court of appeals made clear that the insurer paid only *actual cash value* and that the insured would be entitled to further replacement cost payments *only* when the insured made repairs or replacements. *See Ortiz v. State Farm Lloyds*, 568 S.W.3d 156, 158 (Tex.App.—San Antonio 2017), *aff'd in part, rev'd in part*, 589 S.W.3d 127 (Tex. 2019).

The Fifth Circuit agrees. In considering Texas law, it similarly found that payment of actual cash value sufficed as payment of an appraisal award where the insured had not yet completed repairs. *See Mainali*, 872 F.3d at 257 ("The appraisal panel issued an appraisal award of $387,925.49 as actual cash value and a replacement cost value of $449,349.61. The former was the relevant figure as [the insured] did not repair or replace the Property."). Another federal court in Texas looked at a contract—one with language identical to the contract in this case—and found that "[t]he plain import of this passage is that while [the insured] may elect to recover on a replacement cost basis, it may only do so once it has repaired or replaced the lost or damaged property." *Devonshire v. Real Estate & Asset Mgmt., LP v. Am. Ins. Co.*, 3:12-CV-2199-B, 2014 WL 4796967, at *5 (N.D. Tex. Sept. 26, 2014); *see also Fitzhugh 25 Partners, LP v. KILN Syndicate KLN 501*, 261 S.W.3d 861, 863 (Tex.App.—Dallas 2008, pet. denied) ("[C]ourts across the country that have considered the meaning of the same or similar language in a property insurance policy have universally held that such language requires repair or replacement of the destroyed property before the insured is entitled to recover replacement cost damages.").

To save its claim to full replacement cost, Plaintiff's response refers—for the first time and in a footnote— to what the Court assumes to be the equitable doctrine of prevention. Under that doctrine, "when a promisor wrongfully prevents a condition from occurring, that condition is excused." *Mendoza v. COMSAT Corp.*, 201 F.3d 626, 631 (5th Cir. 2000). Specifically, Plaintiff argues that "[d]ue to Everest's delay in payment, it was not reasonably possible for Lakeside to have completed repairs." Docket no. 50 at 8, n.8. That doctrine does not save Plaintiff's claim, as "no Texas court has employed the doctrine of prevention to vitiate an insured's contractual obligation to repair or replace damaged property before claiming payment for replacement costs." *Devonshire*, 2014 WL 4796967, at *7. In other jurisdictions where the doctrine of prevention *has* been applied in this

scenario, "the insurer either completely denied the claim or refused to make any payments until it was too late for the insured, who was frequently an unsophisticated party, to make repairs." *Id.* (collecting cases). In contrast, "courts have refused to extend the doctrine where the insurer already paid the insured actual cash value or where the dispute took place in a commercial setting and involved relatively sophisticated parties." *Id.* (citing *Md. Cas. Co. v. Knight*, 96 F.3d 1284, 1292 (9th Cir. 1996)).

Here, the dispute took place in a commercial context between relatively sophisticated parties, and Everest made both pre-appraisal payments—including a payment for $1,672,031.67 over three years ago—and actual cash value payments that Plaintiff could have used to make repairs in the ensuing years. When Everest paid the appraisal awards on November 14, 2018, total payments made to Plaintiff on property damage amounted to $4,406,607.39, but Plaintiff has not—according to its briefing—done such repairs, nearly four years after the hailstorm. Accordingly, to the extent that Plaintiff invokes the doctrine of prevention to save its breach of contract claim, that argument fails.

The contract is clear, as is the case law interpreting similar—or identical—provisions: actual cash value is the appropriate amount in determining whether Everest has paid the appraisal award, at least where Plaintiff has undertaken no repairs that would entitle it to replacement cost value. And because Everest has fully paid that actual cash value award from the appraisal, Plaintiff's breach of contract claim is barred. *Ortiz*, 589 S.W.3d at 132; *Mainali*, 872 F.3d at 258; *Hurst*, 523 S.W.3d at 845; *Quibodeaux*, 655 Fed. App'x at 986–87. This, of course, does not mean that Plaintiff is barred from receiving the full replacement cost value if it undertakes the repairs. Indeed, Defendants agree that when Plaintiff makes the repairs, Plaintiff may submit a supplemental claim to recover the withheld replacement cost payments. Docket no. 51 at n. 6.[16]

---

[16] As with the breach of contract claim, Plaintiff concedes that if Everest had fully paid the appraisal award, its common law and statutory bad faith claims should be dismissed. Docket no. 50 at 1–2. Indeed, Plaintiff already

## B. The Texas Prompt Payment of Claims Act

Plaintiff's next claim is that "Everest, through Engle Martin and Christopher McCoy"[17] violated various sections of Chapter 542 of the Texas Insurance Code, also known as the Texas Prompt Payment of Claims Act ("TPPCA"). Docket no. 1-1 at 15–16. For both the hail and tornado claims, Plaintiff claims that those defendants:

> [H]ave not accepted/rejected [Plaintiff's] claim within 36 days after receiving notice of the claim, failed to pay [Plaintiff] within 75 days of receiving notice, and failed to pay within 20 business days after making a claims determination.

*Id.* at 15. These delays, Plaintiff claims, entitle Plaintiff to an 18% annual interest rate, the calculation of which begins on the date of the first statutory violation. *Id.* Defendants respond that: (1) because Everest made a claim determination and payments before appraisal, the fact that appraisal was later demanded does not change the fact that it complied with the TPPCA with its pre-appraisal payments; (2) once the appraisal awards were issued, Everest timely paid them in full; and (3) Everest's

---

dismisses those claims with respect to the tornado because Everest has paid the "full amount" of the appraisal award, given that the actual cash value and replacement cost appraisals were identical. Docket no. 50 at 7–8.

Because the Court has found that Everest has fully paid the appraisal award for the hail claim as well—and thus has fully complied with its contractual obligations—then Plaintiff's claims for common law and statutory bad faith are also dismissed. *See Ortiz*, 589 S.W.3d at 129 (holding insurer's payment of appraisal award barred common law and statutory bad faith claims to the extent the only actual damages sought are lost policy benefits); *see also Lopez v. Allstate Texas Lloyds*, No. 7:18-CV-260, 2020 WL 292342, at *9 (S.D. Tex. Jan. 21, 2020) (granting summary judgment on extracontractual claims where insurer paid appraisal award because that payment provides "all policy benefits to which [the plaintiff] is entitled"); *Dunne v. Allstate Vehicle and Prop. Ins. Co.*, No. H-18-4519, 2020 WL 130101, at *2 (S.D. Tex. Jan. 10, 2020) (same); *Alcala v. Republic Lloyds*, No.13-18-26-CV, 2020 WL 830840, at *3 (Tex.App.—Corpus Christi Feb. 20, 2020, no pet.) (citing *Ortiz* to grant summary judgment on statutory bad faith claims under both Chapter 541 and the DTPA). To the extent Plaintiff argues that its request for attorney's fees, court costs, or exemplary damages save the extracontractual claims, those are not considered actual damages, but are recoverable only upon an award of underlying actual damages, and thus do not save the contractual and bad faith claims. *Ortiz*, 589 S.W.3d at 134–35.

[17] As explained in this Court's order finding that Koralewski was improperly joined, insurance adjusters like Engle Martin and McCoy cannot be held liable for violating Chapter 542. *See* TEX. INS. CODE § 542.002; *Lopez v. United Prop. & Cas. Ins. Co.*, 197 F. Supp. 3d 944, 951 (S.D. Tex. 2016) (citing *Mainali Corp. v. Covington Specialty Ins. Co.*, 3:15-CV-1087-D, 2015 WL 5098047, at *6 (N.D. Tex. Aug. 31, 2015)). The TPPCA applies only to insurers and not to insurance adjusters, and Engle Martin and McCoy acted as insurance adjusters and thus cannot be held liable under Chapter 542. *See id.* at *6 ("Chapter 542 only applies to specifically listed 'insurers,' and Summers, an adjuster, is not an insurer.").

investigation was incomplete when Plaintiff abruptly filed suit without notice to Everest. Docket no. 49 at 5–6. Further, Defendants' reply stresses the extent to which Defendants unsuccessfully sought information from Plaintiff, and the extent to which Plaintiff's delay in signing any Proof of Loss and Plaintiff contractor's delay in providing an estimate were the actual causes of any delay. Docket no. 51.

1. *The Texas Prompt Payment of Claims Act*

The TPPCA provides for additional damages when an insurer wrongfully refuses or delays payment of a claim. *Weiser-Brown Operating Co. v. St. Paul Surplus Lines Ins. Co.*, 801 F.3d 512, 518 (5th Cir. 2015) (citing *Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 16 (Tex. 2007)). To recover interest under the statute, an insured must establish: "(1) a claim under an insurance policy; (2) that the insurer is liable for the claim; and (3) that the insurer has failed to follow one or more sections of the [TPPCA] with respect to the claim." *Lamar Homes*, 242 S.W.3d at 16 (citing *GuideOne Lloyds Ins. Co. v. First Baptist Ch. of Bedford*, 268 S.W.3d 822, 830–31 (Tex.App.—Fort Worth 2008, no pet.)). The TPPCA is to be "liberally construed to promote the prompt payment of insurance claims." TEX. INS. CODE. § 542.054. Nonetheless, the burden is on the insured to establish its right to the statutory delay penalty. *Neff. v. Allstate Vehicle & Prop. Ins. Co.*, No. 5:17-C-191-DAE, 2019 WL 1560473, at *6 (W.D. Tex. Feb. 28, 2019) (citing *Republic Underwriters Ins. Co. v. Mex-Tex, Inc.*, 150 S.W.3d 423, 427 (Tex. 2004)).

The TPPCA sets forth a series of rules guiding the handling and payment of claims. *See* TEX. INS. CODE §§ 542.055–058. In *Weiser-Brown*, the Fifth Circuit summarized those rules:

> First, § 542.055, entitled "Receipt of Notice of Claim," provides that within fifteen days of receiving notice of a claim, the insurer must acknowledge receipt of the claim, commence an investigation, and request "all items, statements, and forms that the

insurer reasonably believes, at the time, will be required from the claimant." TEX. INS. CODE § 542.055(a). [18]

Next, § 542.056, entitled "<u>Notice of Acceptance or Rejection of Claim</u>," requires the insurer to "notify a claimant in writing of the acceptance or rejection of a claim not later than the 15th business day after the date the insurer receives all items, statements, and forms required by the insurer to secure final proof of loss." [*Id.*] § 542.056(a). The statute allows insurers to extend this deadline for an additional forty-five days if "the insurer is unable to accept or reject the claim" and "notif[ies] the claimant of the reasons that the insurer needs additional time. [*Id.*] § 542.056(d).

[Under § 542.<u>057</u>, entitled "<u>Payment of Claim</u>"], if the insurer accepts the claim and "notifies a claimant under [§] 542.056 that the insurer will pay a claim or part of a claim," it has five days to do so. [*Id.*] § 542.057(a).[19]

Finally, § 542.<u>058</u>, entitled "<u>Delay in Payment of Claim</u>," provides that "if an insurer, after receiving all items, statements, and forms reasonably requested and required under [§] 542.055, delays payment of the claim…for more than 60 days, the insurer shall pay damages and other items as provided by [§] 542.060. [*Id.*] § 542.058(a).

*Weiser-Brown*, 801 F.3d at 518–19 (emphasis added). All deadlines are extended by 15 calendar days (not business days) if the claim arises from a weather-related catastrophe. TEX. INS. CODE § 542.059(b).

Finally, "Section 542.060 provides the 'enforcement mechanism' for the statute's deadlines." *Weiser-Brown*, 801 F.3d at 519 (quoting *Cox Operating LLC v. St. Paul Surplus Lines Ins. Co.*, 795 F.3d 496, 505 (5th Cir. 2015)). That section provides that if an insurer is liable for an insurance claim under one of the previously described sections, "the insurer is liable to pay the holder of the policy…interest on the amount of the claim at a rate of 18 percent a year as damages, together with reasonable attorney's fees." TEX. INS. CODE § 542.060(a). "[A] violation of *any* of the Act's

---

[18] If the insurer is an eligible surplus lines insurer, the insurer has <u>30</u> business days after receiving notice. TEX. INS. CODE § 542.055(a). Further, the insurer may make additional requests for information if during the investigation, such requests are necessary. *Id.* § 542.055(b).

[19] But "[i]f the insurer is an eligible surplus lines insurer"—which the parties here do not dispute—"the insurer shall pay the claim not later than the 20th business day after the notice or the date the act is performed…. TEX. INS. CODE. § 542.057(c).

deadlines…begins the accrual of statutory interest under § 542.060." *Cox Operating*, 795 F.3d at 509 (emphasis in original).

A recent Texas Supreme Court case clarified how later payment of an appraisal award affects an insurer's liability under the TPPCA. *Barbara Techs. Corp. v. State Farm Lloyds*, 589 S.W.3d 806 (Tex. 2019). In that case, the insurer initially rejected the insured's claim after finding that the damages were less than the deductible. *Id.* at 809. The insured brought suit, alleging violations of the TPPCA. *Id.* An appraisal then found the damages to be greater than the deductible, and the insurer paid accordingly. *Id.* The trial court granted summary judgment against the insured on the TPPCA claim, and the court of appeals affirmed, holding that "a full and timely payment of an appraisal award under an insurance policy precludes an insured from recovering damages under the [TPPCA], as a matter of law." *Reyna v. State Farm Lloyds*, No. H-19-3726, 2020 WL 1187062, at *3 (S.D. Tex. Mar. 12, 2020) (citing *Barbara Techs.*, 589 S.W.3d at 810). In reversing, the Texas Supreme Court held that "invocation of the contractual appraisal provision to resolve a dispute as to a claim rejected in accordance with the TPPCA's procedural requirements neither subjects an insurer to TPPCA damages nor insulates the insurer from TPPCA damages." *Barbara Techs.*, 589 S.W.3d at 827. The court clarified that "[a]n insurer will become liable for TPPCA damages under section 542.060 only if it (1) accepts liability or is adjudicated liable under the policy, and (2) violated a TPPCA deadline or requirement." *Id.* at 827–28.

In so holding, the court found *Breshears* instructive. *Id.* at 821 (citing *Breshears v. State Farm Lloyds*, 155 S.W.3d 340 (Tex.App.—Corpus Christi 2004, pet. denied)). In *Breshears*, the insurer made an initial payment, the insured sued, and the claim was appraised at a higher value than the insurer's initial payment. *Breshears*, 155 S.W.3d at 342. The insurer then paid the difference between the pre-appraisal payment and the appraisal award, but the insured argued that because of the appraisal

process, they were not actually paid under the TPPCA until full payment of the appraisal award—which was well beyond the TPPCA deadline. *Id.* at 345. The *Breshears* court disagreed, holding that "[t]he fact that the appraisal process was later invoked does not alter the fact that [the insurer] complied with the [TPPCA], and provided a reasonable payment within a reasonable time." *Id.*

The *Barbara Technologies* court further cited approvingly to a recent Fifth Circuit case which held that an insurer did not violate the TPPCA when it complied with the TPPCA's requirements to investigate and evaluate a claim but later made an appraisal payment. *Barbara Techs.*, 589 S.W.3d at 823 (citing *Mainali.*, 872 F.3d at 258–59). In sum, the Texas Supreme Court held that "when an insurer complies with the TPPCA in responding to the claim, requesting necessary information, investigating, evaluating, and reaching a decision on the claim, use of the contract's appraisal process does not vitiate the insurer's earlier determination on the claim." *Id.* (approvingly citing *Mainali* and *Breshears*).

This is not to say that an insurer can make an initial pro-forma payment of, say, $100 to satisfy "compliance" with the TPPCA, only much later accepting a higher appraisal amount once the insured has been forced to undergo an appraisal. Rather, any such pre-appraisal payment must be *reasonable* and, of course, within the statutory guidelines. *Mainali*, 872 F.3d at 259 (holding there is no TPPCA violation if the pre-appraisal payment was reasonable); *see also Breshears*, 155 S.W.3d at 345 (rejecting TPPCA claim where the insurer "complied with the insurance code, and provide a reasonable payment within a reasonable time"); *Hyewon Shin v. Allstate Texas Lloyds*, No. 4:18-CV-1784, 2019 WL 4170259, at *2 (S.D. Tex. Sept. 3, 2019) ("[T]he Court reads *Barbara Technologies*, in conjunction with *Mainali*, as standing for the proposition that, in order for an insurer to avoid a

Prompt Payment Act claim…the insurer must have made a reasonable pre-appraisal payment within the statutorily-provided period.").[20]

In *Mainali*, the pre-appraisal payment was undoubtedly reasonable because it exceeded the amount later awarded by the appraisal panel. *Mainali*, 872 F.3d at 259. Where the pre-appraisal amount is *less* than the ultimate appraisal award, courts have still found the pre-appraisal payment to be reasonable where the appraisal award was 6.8 times the pre-appraisal amount. *Hinojos v. State Farm Lloyds*, 569 S.W.3d 304, 313 (Tex.App.—El Paso, pet. filed); *Shin*, 2019 WL 4170259, at *2 (5.6 times); *Reyna*, 2020 WL 1187062, at *4 (3.9 times); *Crenshaw v. State Farm Lloyds*, 4;18-CV-236, __F. Supp. 3d __, 2019 WL 7756078, at *8 (N.D. Tex. Nov. 22, 2019) (3.6 times).

*Barbara Technologies* thus instructs that Everest's ultimate payment of the appraisal award does not "vitiate" its arguable compliance with the TPPCA before appraisal. *Barbara Techs.*, 589 S.W.3d at 823. The analysis then proceeds as follows: first, did Defendants act in accordance with the TPPCA in their requests for information, investigation, and pre-appraisal payments? *Id.* at 827; *Breshears*, 155 S.W.3d at 342. Second, if the pre-appraisal payments were indeed timely, were they also reasonable relative to the final appraisal award? *Mainali*, 872 F.3d at 259.

_____

[20]In asking the Court to find that there is no "reasonableness" defense, Plaintiff asks the Court to find that *Barbara Technologies* overruled *Mainali*, in essence asking the Court to find that the Fifth Circuit was incorrect. *See* docket no. 50 at 18. But for this Court to find that a state court decision overturned Fifth Circuit precedent, "at minimum, a contrary ruling squarely on point is required." *F.D.I.C. v. Abraham*, 137 F.3d 264, 269 (5th Cir. 1998). And here, there is no such contrary ruling. Rather, *Barbara Technologies* approvingly cites *Mainali* (as explained above) and does not discuss whether an insurer can defend its pre-appraisal payment as "reasonable." In any event, if the reasonableness requirement of *Mainali* were overturned, then an insurer could do as described above: make a minimal payment within the TPPCA guidelines (satisfying *Barbara Techs.* and *Breshears*), forcing the insured to compel an appraisal, and paying the much larger appraisal award only then. This would, in effect, incentivize insurers to make an initial TPPCA-compliant pre-appraisal payment with no regard to what damages the insured may face, thus detracting from the policy goals underlying the TPPCA. If the pre-appraisal payment is reasonable (*Mainali*), and the insurer complies with the TPPCA guidelines before appraisal (*Barbara Techs.* and *Breshears*), then there is no TPPCA liability. *See Crenshaw*, 2019 WL 7756078, at *7–9 (finding that nothing in *Barbara Technologies* overturned the reasonableness inquiry in *Mainali*).

2. *Did Defendants comply with the TPPCA?*

First, the Court will proceed through the TPPCA guidelines to determine if Defendants complied with those deadlines before appraisal.

    a. <u>Deadline to acknowledge receipt, investigate, request information</u>

Section § 542.055 requires surplus-lines insurers like Everest to acknowledge the claim, begin investigating the claim, and ask the claimant for necessary information within 30 business days after receiving notice. TEX. INS. CODE § 542.055. Plaintiff's petition does not raise § 542.055, but Plaintiff's response to Defendants' motion relies heavily on that section. Defendants ask the Court to disregard any such claim because it is not in the live petition. Docket no. 51 at 8–9. Plaintiff's response, however, uses § 542.055 as a means of triggering the deadline to accept or reject the claim under § 542.056, a claim which *is* in the petition. In essence, Plaintiff argues that Defendants never requested further information under § 542.055 which means that Defendants had "all items, statements, and forms" they require "to secure final proof of loss" as of the date they received notice of Plaintiff's claim. Docket no. 50 at 13 (citing *Devonshire*, 2014 WL 4796967, at *23). If true, that would mean the deadline to accept or reject under § 542.056 was triggered as of the date Defendants received notice of the claim.

For the 2016 hail claim, Plaintiff provided written notice on April 20, 2016. Docket no. 50-1 at 1. This triggers the 30 business day (plus 15 calendar days for weather-related claims) deadline in § 542.055. Defendants, then, were required to acknowledge receipt, commence any investigation, and request all items, statements, and forms that Defendants reasonably believed, at the time, would be required from Plaintiff by <u>June 17, 2016</u>.[21] Defendants met that deadline. Plaintiff's claim that

---

[21] This date was calculated by adding 30 business days and 15 calendar days from the date Plaintiff provided notice of the hail claim.

Defendants did not request any items, statements, or forms is flatly contradicted by the summary judgment evidence. On April 22, well within the deadline, McCoy first emailed Plaintiff's property claim insurance representative, Krier, asking for information, bids, and/or invoices, and Krier forwarded McCoy to Coleman, Plaintiff's primary contractor. Docket no. 51-1 at 3–4. The subsequent delay seems largely at the hands of Coleman, who first told McCoy on May 13 that she was "approximately a week away" from finalizing the estimate, but over a month later, on June 17, McCoy had yet to receive any such estimate from Coleman. Docket no. 50-1 at 1; no. 50-2 at 3–4. On that same day, McCoy—pursuant to his ability to request additional information under § 542.055(b)— reiterated his request to Coleman that she provide an estimate of that damage so that Defendants could move forward with the loss estimate. Docket no. 50-1 at 1. Coleman did not provide that estimate to Defendants until August 5, 2016. Docket no. 50-5.[22]

  b. <u>Deadline to accept/reject and pay</u>

Next, § 542.056 requires the insurer to "notify a claimant in writing of the acceptance or rejection of a claim not later than the 15th business day after the date the insurer receives all items, statements, and forms required by the insurer to secure final proof of loss." Tex. Ins. Code § 542.056(a). Section 542.057 requires a surplus-lines insurer like Everest to pay all or part of the claim within 20 business days of giving the insured notice that it has accepted all or part of the claim, but if the insurer gives notice that payment of the claim is conditioned on the insured's performance of some act—like returning a sworn proof of loss—the insurer must pay the claim within 20 business days *after the insured performs the act*. *Id.* § 542.057(c).

Plaintiff's petition claims that, for both the hail and tornado claims, Defendants failed to accept or reject Plaintiff's claim "within 36 days after receiving notice of the claim…." Docket no.

---

[22] For the tornado claim, Plaintiff concedes that Defendants timely acknowledged receipt and requested additional items from Plaintiff. Docket no. 50 at 15.

1-1 at 15. This misconstrues the statute, which requires an insurer to accept or reject not within 15 business days of *notice*, but rather 15 business days after the insurer "receives all items, statements, and forms required by the insurer to secure final proof of loss." In other words, the deadline to accept or reject is triggered when the insured provides the information requested by the insurer, *not* the date the insured receives notice of the claim.

Under a proper application of the statute, Defendants satisfied § 542.056 and .057. To "secure final proof of loss" under both policies, Everest required a sworn proof of loss as a condition for payment. Docket no. 49-1 at 48; no. 49-2 at 46 (requiring sworn proof of loss and either an agreement on the amount of loss or the issuance of an appraisal award). Defendants made this requirement clear to Plaintiff, repeatedly requesting that Plaintiff sign the initial Proof of Loss to permit Everest to issue payment on the undisputed amounts. *See, e.g.* docket no 51-2. Defendants initially accepted a claim for $250,000—even before receiving all requested information, including Coleman's estimate—giving that Proof of Loss to Plaintiff on June 24, 2016. Docket no. 51-2 at 1–2. Though unclear in its petition and briefing, Plaintiff may allege that this triggers the deadline under § 542.057 (the deadline to pay after accepting a claim), but § 542.057(c) gives Everest 20 business days *after Plaintiff signs the Proof of Loss* to pay. TEX. INS. CODE § 542.057(c); docket no. 49-1 at 48; no. 49-2 at 46.

For the 2016 hail claim, the deadline to pay was not triggered until Plaintiff returned the signed Proof of Loss, both for the initial $250,000 and the second payment of $1,672,031.67. On <u>July 7, 2016</u>, Krier returned the first signed Proof of Loss to McCoy, apologizing for the delay and indicating that "she thought we had already handled this" but that she had been involved with other transactions. Docket no. 51-4 at 3.  Having received that signed Proof of Loss, Everest made a timely payment of $250,000 on <u>July 22, 2016</u>. Docket no. 49-3.

On that same date, McCoy sent to Krier a second Proof of Loss for $1,672,031.67, requesting that Plaintiff sign that Proof of Loss for disbursement of the then-undisputed amount. Docket no. 51-4 at 2. Krier indicated that several items were missing from that amount, to which McCoy reiterated that they were *still* waiting on estimates from Coleman, Plaintiff's contractor. *Id.* Plaintiff did not return that signed Proof of Loss until <u>November 28, 2016</u>, thus triggering the deadline to pay on that date. Docket no. 51-8 at 2; Tex. Ins. Code § 542.057(c). Everest thereafter timely issued a check for $1,607,031.67 on <u>December 13, 2016</u>. Docket no. 49-5.[23] And for the business interruption claim related to the hailstorm, McCoy first sent a letter to Krier requesting information on December 11, 2016. Docket no. 51-11 at 1. On January 30, 2017, he sent another email requesting the same information, but Plaintiff never sent sufficient supporting documentation for that claim, and thus the deadlines set forth in the TPPCA were not triggered.

For the 2017 tornado claim, Defendants never received all items reasonably requested and, therefore, the deadline to accept or reject in § 542.056 was not triggered, as that deadline requires that the insured provide all items, statements, and forms required by the insurer to secure final proof of loss. Tex. Ins. Code § 542.056. Days after the tornado, Koralewski spoke with Krier who—as with the hail claim—directed Koralewski to speak with Coleman. Docket no. 50-4 at 5. On March 31, 2017, Koralewski emailed Krier with several requests. Docket no. 50-5 at 1. Koralewski stressed how imperative it was that the estimate separate damage that resulted from the 2016 hailstorm from new damage resulting from the 2017 tornado. *Id.* He noted that "[w]ith the exception of the invoice you [Krier] provided, we have receive [sic] no additional documentation from Ms. Coleman. Could you

---

[23] Though Plaintiff's petition is unclear as to which TPPCA deadline it alleges, both pre-appraisal payments were also within the 60-day deadline of § 542.058 which requires the insurer to pay within 60 days of "receiving all items, statements, and forms reasonably requested." Everest timely made such payments once it received the signed proof of loss that it reasonably requested of Plaintiff.

please request that they provide our office with the necessary documentation to substantiate your claim for damages?" *Id.* In that request, Koralewski noted that Coleman advised him she would provide the estimate, would forward photographs from the property, and would provide a copy of the engineer's evaluation. *Id.*

Before responding to those requests brought pursuant to § 542.055, Plaintiff brought suit. Docket no. 1-1. In fact, it was not until the day *after* Plaintiff filed suit, April 28, that Plaintiff provided McCoy with Coleman's estimate or the engineer's evaluation. Docket no. 50-6 at 1; no. 50-1 at 2. And further confusing the investigation, Coleman's report included roofing repairs that were covered by the hail claim. Docket no. 50-6 at 1. The Court questions then how Defendants could have been under an obligation to accept, reject, and pay for a claim when the necessary documentation had not been given to the insurer as of the date Plaintiff brought suit. The policies both require that Plaintiff "cooperate with [Everest] in the investigation," docket no. 49-1 at 58; no. 49-2 at 56, and such cooperation entails providing requested documentation before bringing suit claiming that Defendants have caused delay. Under Plaintiff's interpretation of the TPPCA, an insured could make a claim and then ignore or delay the insurer's requests for information necessary to secure proof of the loss until well past the alleged TPPCA deadlines, thereby bringing suit to reap the benefits of its—or its contractor's—own delay. The Court finds no basis to believe the TPPCA allows an insured to do as such.[24]

---

[24] And even if Plaintiff had provided *some* of those documents before bringing suit, § 542.056 does not trigger the duty to accept or reject until "after the date the insurer receives *all* items, statements, and forms required by the insurer to secure final proof of loss." TEX. INS. CODE § 542.056 (emphasis added). Further, while Everest's $8,000 advance payment did not come until February of the following year, Defendants were under no TPPCA obligation to pay because Plaintiff never signed a proof of loss for the tornado claim, a condition required to trigger the obligation to pay under § 452.057 and the contract. Nor did an obligation arise under § 452.058, which requires that the insured provide *all* items, statements, and forms reasonably requested. Plaintiff provided neither a signed proof of loss—as required by the contract—nor did Plaintiff provide "all items, statements, and forms" that *Coleman* herself promised to provide to Defendants.

3. *Were the pre-appraisal payments reasonable?*

Finally, the Court must consider whether the pre-appraisal payments were reasonable relative to the final appraisal amount. *Mainali*, 872 F.3d at 259; *Breshears*, 155 S.W.3d at 245. For the property damage on the hail claim, the total pre-appraisal payments amounted to $1,922,031.67. *See* docket no. 49-3 ($250,000); docket no. 49-5 ($1,672,031.67). The actual cash value appraisal award was $4,150,745.57. The final appraisal award, then, was 2.159 times greater than the pre-appraisal award. Other courts have found higher ratios to still be reasonable, including amounts of 6.8 (*Hinojos*), 5.6 (*Shin*), 3.9 (*Reyna*), and 3.6 (*Crenshaw*). The Court thus finds that Everest's pre-appraisal payments on the hail claim were reasonable.

For the 2017 tornado claim, Defendants never received all items reasonably requested and, therefore, the deadline to accept or reject in § 542.056 was not triggered. Accordingly even though Everest made a pre-appraisal payment of only $8,029.86, and the appraisal award amounted to $247,831.96, 31 times larger than the pre-appraisal award, the Court need not reach any finding on the reasonableness because Plaintiff fails at step two of the analysis.

## CONCLUSION

In sum, the Court concludes that Defendants' motion for summary judgment (docket no. 49) is GRANTED.

It is so ORDERED.

SIGNED this 8th day of April, 2020.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE